A95A2488. LEE v. SATILLA HEALTH SERVICES, INC.
(470 SE2d 461)

RUFFIN, Judge.

In this medical malpractice action, Mrs. Azalee Lee sued Dr. Clyde Tanner and Satilla Health Services, Inc. ("the hospital") for Dr. Tanner's failure to diagnose she was suffering from a stroke when she arrived at the hospital's emergency room. Mrs. Lee alleged that Dr. Tanner's negligence could be imputed to the hospital. She also alleged that the hospital negligently selected and retained Dr. Tanner to provide services in the emergency room given the number of lawsuits that have been filed against him. The hospital moved for summary judgment on four grounds, and the trial court granted the motion without specifying the grounds upon which its order was based. On appeal, Mrs. Lee contends only that the trial court erred in granting summary judgment on the issues of agency and proximate cause. Because we find that material issues of fact remain with respect to those issues, we reverse.

1. Mrs. Lee contends the trial court erred in granting the hospital summary judgment because material issues of fact remain as to whether Dr. Tanner was the hospital's employee. The hospital asserts that its contract with Dr. Tanner affirmatively established that he was an independent contractor and that nothing in the contract seeks to control the time, manner or method by which he treated patients. See *Hodges v. Doctors Hosp.*, 141 Ga. App. 649 (2) (234 SE2d 116) (1977). The contract, however, is nowhere to be found in the record. Moreover, the labels ascribed by a contract are not determinative of the parties' legal relationship. *Gray v. Vaughn, P.C.*, 217 Ga. App. 872, 874 (2) (460 SE2d 86) (1995). "The concern is with essence, not nomenclature." *Stewart v. Midani*, 525 FSupp. 843, 847 (N.D. Ga. 1981).

In *Midani*, a medical malpractice case involving this very issue, the court referenced an earlier decision, *Harris v. City of Chattanooga*, 507 FSupp. 365 (N.D. Ga. 1980), in which it "canvassed nearly fifty decisions of the Georgia appellate courts in an effort to distill the essence of the employee-independent contractor controversy." *Midani*, supra at 849. The court articulated several factors which were frequently considered by the Georgia courts in making that determination. We will consider those factors applicable to this case: (1) The employer's right to make additional plans and specifications; to impose its will in lieu of the contract's provisions; and to direct the employee's work step by step. In this case, Dr. Tanner testified that the hospital did not tell him how to perform a physical exam or diagnose a patient's condition, which would "indicate[ ] that [he] was an independent contractor." Id. But Dr. Tanner also testified that he could not refuse an order to do "such and such" from the hospital administrator. Whether such an order could affect the manner in which Dr. Tanner practiced medicine is unknown. Given the potentially conflicting nature of these statements on the issue of control, we find that a jury issue is raised with respect to this factor of the analysis. (2) Contracts to perform a service rather than to accomplish a task. "The latter are indicative of an independent contractor relationship, the former of an employee-employer relationship." Id. Because Dr. Tanner was obligated to provide 24-hour a day coverage in the emergency room, "i.e., to provide that service," this factor indicates he was the hospital's employee. Id. (3) The right of the employer to inspect the employee's work. Since there is no evidence of record that the hospital had such authority, we find that Dr. Tanner would be classified as an independent contractor under this factor. (4) Does the employer or the employee supply the equipment? Dr. Tanner testified that the hospital furnished the medical supplies and equipment such as CAT scans and x-ray machines that he used, as well as the drugs which were administered to patients in the emergency room. This

would suggest that Dr. Tanner was an employee. See *Daughtrey v. Honeywell, Inc.*, 3 F3d 1488 (11th Cir. 1993). (5) The nature or skill of the employee's work. "The more skilled the employee, the more likely he is an independent contractor." *Midani*, supra. Thus, Dr. Tanner would likely be an independent contractor under this test. (6) The employer's right to control the employee's time. Here, the hospital demanded that Dr. Tanner provide coverage 24 hours a day, but did not dictate his personal schedule. This factor indicates that Dr. Tanner was an independent contractor. Id.; *Newton County Hosp. v. Nickolson*, 132 Ga. App. 164, 167 (2) (207 SE2d 659) (1974). (7) The method of payment. If an employee is paid "for the entire task performed, this evidences an independent contractor relationship. If, however, . . . the employee is paid by the hour, that exemplifies an employee-employer relationship." *Midani*, supra. See also *Nickolson*, supra; *Whitaker v. Zirkle*, 188 Ga. App. 706, 708 (2) (374 SE2d 106) (1988). Because Dr. Tanner was paid a salary rather than an hourly wage, this bodes in favor of an independent contractor relationship in this setting. However, as the *Midani* court pointed out in its own analysis of the most significant Georgia appellate case on the subject, the basis of the pay, i.e., whether the hospital paid the physician, is more important than "the employer's right to choose the scalpel to be used or the location of the incision." *Midani*, supra at 849; *Hodges*, supra. Here, the hospital, rather than an emergency services group, paid Dr. Tanner. This indicates that he was an employee.

Given that the foregoing evidence does not conclusively establish whether Dr. Tanner was an employee or an independent contractor, summary judgment on this basis was not appropriate.

2. Mrs. Lee also contends the trial court erred in granting summary judgment because a material issue of fact remains as to whether Dr. Tanner's treatment of her in the emergency room was the proximate cause of her injury. We agree.

In her complaint, Mrs. Lee alleged that Dr. Tanner negligently sent her home from the emergency room and "prevented the administration of therapies that could have prevented the progression of the stroke." Her expert witness, Dr. Nichols, testified that Dr. Tanner's evaluation of Mrs. Lee and lack of treatment fell below the acceptable standard of care. Citing *Goggin v. Goldman*, 209 Ga. App. 251 (433 SE2d 85) (1993), the hospital contends that summary judgment was nonetheless appropriate because "[n]egligence alone is insufficient to sustain recovery. It must be proven that the injury . . . proximately resulted from [the failure to exercise the requisite] care or skill. A bare possibility of such result is not sufficient. Additionally, there can be no recovery for medical negligence involving an injury to the patient where there is no showing to any reasonable degree of medical certainty that the injury could have been avoided." (Citations and

punctuation omitted.) Id. at 252-253. Accordingly, the hospital argues that despite Dr. Nichols' testimony that Dr. Tanner's care was substandard, it has no liability because there has been no proof to a reasonable degree of medical certainty that Mrs. Lee's outcome would have been different had Dr. Tanner diagnosed her stroke in the emergency room.

We believe the hospital misses the point. It focuses entirely upon isolated excerpts in Dr. Nichols' deposition where, in response to questioning by the hospital, he agreed that there are no "scientific data" to prove that early diagnosis and intervention would have changed Mrs. Lee's prognosis. What the hospital loses sight of is Dr. Nichols' overwhelming testimony that in his experience and that of his colleagues, proper diagnosis and treatment can change the patient's course and outcome and that clinical research trials are currently being conducted in the scientific community in order to confirm what he and his colleagues already believe to be a fact: "There is evidence that we actually can make a difference [in a stroke patient's outcome] but that's based on the experimental trials that we're going through now. And while many of us have very strong feelings that you should intervene . . . there has been no scientific proof [of] this. . . . In the last few years people have begun to recognize that . . . if we can intervene in the first few hours . . . that we can either reverse the process or more typically prevent progression of the process. . . . Most of us that take care of strokes think that if we catch them at that point [where Mrs. Lee was when she arrived] we can prevent them from getting worse. . . . It is possible that emergency treatment early in the morning would have prevented her stroke from getting worse. There is no proof . . . that would have happened. But I think it certainly would have given her a better chance of not progressing. . . . Most of us with stroke [patients] think that we can potentially turn them around if we catch them early . . . , and that's why we're involved in these [research] trials. . . . We've got a lot of hope [that] we can prevent progression by administration of drugs, but those therapies have not been rigorously proven to be effective."

In fact, Dr. Nichols testified that it is precisely because his opinion on the subject has not yet been adequately tested that it is an opinion, not a medical certainty. Because of that explanation, we do not believe the rule in *Goldman* can be applied so rigidly so as to take proximate cause away from the jury. In other words, Dr. Nichols' testimony that he has no scientific proof that appropriate treatment by Dr. Tanner would have changed Mrs. Lee's outcome cannot be considered in isolation when evaluating whether Mrs. Lee has met her burden in opposition to summary judgment. Rather, it must be considered in tandem with Dr. Nichols' explanation of that statement: that is, because his strong personal belief that with proper interven-

tion "we can prevent [patients] from getting worse" has not been adequately tested, it is not a medical certainty. Because we find that the two must be considered together and in the context of Dr. Nichols' other testimony about his experience and that of his colleagues, we cannot say that Mrs. Lee failed to "prove that [her] injury . . . proximately resulted from [Dr. Tanner's lack] of care or skill." (Citations and punctuation omitted.) *Parrott v. Chatham County Hosp. Auth.*, 145 Ga. App. 113, 115 (243 SE2d 269) (1978). Accordingly, summary judgment on that basis was inappropriate.

3. Mrs. Lee does not enumerate as error the grant of summary judgment on her claim that the hospital negligently selected and retained Dr. Tanner. Nor has she offered any evidence to support that claim. Thus, the trial court did not err in granting the hospital summary judgment on this issue.

*Judgment reversed. Beasley, C. J., and Pope, P. J., concur.*

DECIDED MARCH 13, 1996 —
RECONSIDERATION DENIED MARCH 28, 1996 — 

*Benjamin Smith, Jr., Leon A. Wilson II*, for appellant.
*Dillard, Bower & East, Terry A. Dillard, Bryant H. Bower, Jr., Robert W. Lamb*, for appellee.